## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on October 30, 2025

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Grand Jury Original** |
| | : | **CRIMINAL NO.** |
| | : | |
| | : | **VIOLATIONS:** |
| | : | |
| **JOHN WINDOM,** | : | **18 U.S.C. § 1001(a)(1)** |
| | : | **(Concealment of Material Facts)** |
| | : | |
| **Defendant.** | : | **18 U.S.C. § 1001(a)(2)** |
| | : | **(False Statements)** |
| | : | |
| | : | **18 U.S.C. § 1519** |
| | : | **(Falsification of a Record or Document)** |

## INDICTMENT

The Grand Jury charges that, on or about the times and dates stated herein:

## GENERAL ALLEGATIONS

At all times material to this Indictment, except as otherwise indicated:

1.      The United States Department of Veterans Affairs ("VA") was a department within the Executive Branch of the Government of the United States. Its mission was to provide health, education, disability, funerary, and financial benefits earned by veterans of the United States Armed Forces.

2.      The United States Office of Government Ethics ("OGE") was an agency within the Executive Branch of the Government of the United States. Its mission was to prevent conflicts of interest on the part of Executive Branch employees, in turn strengthening the public's confidence that the Government's business is conducted with impartiality and integrity. Among other things, OGE made and interpreted ethics laws and regulations, monitored senior leaders' compliance with

ethics laws and regulations, made ethics information available to the public, and administered executive branch public financial disclosures, including the Executive Branch Personnel Public Financial Disclosure Report, OGE Form 278e ("OGE-278e").

3.    In June 2017, to ensure continuity of care for veterans, VA Secretary David J. Shulkin, announced that the VA would adopt the same electronic health record ("EHR") system used by the (then-named) Department of Defense ("DoD"), with the goal of providing a single, accurate, lifetime health record for veterans. As the DoD EHR was at its core a commercial off-the-shelf software product manufactured by Cerner Corporation ("Cerner"), Secretary Shulkin also authorized a sole-source solicitation to Cerner.

4.    In or about August 2017, Defendant JOHN WINDOM was appointed to a newly created three-year Limited Term Senior Executive Service ("SES") position as Executive Director of the Office of Electronic Health Record Modernization ("OEHRM"), reporting to the VA Under Secretary for Health. Defendant WINDOM was a Navy Captain who, among other things, had served as a Program Manager for DoD's Defense Healthcare Management System Modernization Program when DoD rolled out Cerner's EHR platform. Defendant WINDOM retired from the Navy effective September 1, 2017.

5.    As Executive Director, Defendant WINDOM was accountable for the long-term vision, strategic management and technical direction of the OEHRM. His initial duties and responsibilities included overseeing the VA's effort to define and acquire a commercial replacement for the agency's legacy EHR system and standing up and managing a newly chartered Program Executive Office with the requisite skillsets to acquire, test, deploy, integrate, and sustain the newly acquired EHR system. In May 2018, under Defendant WINDOM's management and supervision, the VA awarded Cerner a $10 billion contract, then one of the largest information

2

technology contracts in the federal government. Inclusive of that contract, VA officials estimated the total cost of implementing the system at approximately $16 billion. Once the acquisition was complete, Defendant WINDOM's role shifted to leading the VA EHRM program.

6.    In or about July 2020, Defendant WINDOM was converted to a career SES in his position as Executive Director of OEHRM, reporting directly to the Deputy Secretary of the VA. Defendant WINDOM's SES probationary year ended in June 2021, and he retained his SES status. In April 2022, Defendant WINDOM was reassigned from his Executive Director position at OEHRM to the position of Deputy Director of the Federal Electronic Health Modernization Office, a joint DoD-VA initiative to support the delivery of a single, integrated EHR.

7.    As Executive Director of OEHRM and a member of the SES, Defendant WINDOM had a legal duty to comply with gift-acceptance restrictions. Based on his training and experience, Defendant WINDOM was fully aware of ethics laws and regulations restricting his acceptance of gifts from prohibited sources such as a person doing business with or seeking to do business with the VA, a person who has interests that may be substantially affected by the performance or non-performance of his duties, or an organization made up of such people. Further, he understood that he ought to consult an ethics official if he was concerned about a potential ethics violation.

8.    As Executive Director of OEHRM and a member of the SES, Defendant WINDOM also had a legal duty to file an annual public financial disclosure report on Form OGE-278e pursuant to the Ethics in Government Act of 1978, codified until December 2022 at 5 U.S.C. app. 4 §§ 101, et seq., and then recodified (without changing the meaning or effect of existing law) at 5 U.S.C. Chapter 131. Defendant WINDOM submitted the OGE-278e form electronically and it was routed to VA and OGE ethics officials before public disclosure.

3

9.    For the calendar 2020 reporting year, Defendant WINDOM was required and instructed to disclose certain gifts that, in the aggregate, exceeded $415 from a single source during the reporting period, with certain identified exemptions. Defendant WINDOM was further instructed not to aggregate items valued at $166 or less. For any gifts reported, Defendant WINDOM was instructed to list the source's identity, describe the item or reimbursement, provide the fair market value of the item, and optionally, describe his relationship to the source or the basis on which he accepted the gift. Before submitting the report, Defendant WINDOM was presented a warning that knowing and willful falsification of information required to be reported could expose him to disciplinary action, civil penalties, and criminal prosecution. Further, Defendant WINDOM was required to certify that the statements made in the report were true, complete, and correct to the best of his knowledge.

10.    VA ethics officials accepted completed OGE-278e forms at face value and relied on the candor of the filer to provide full and accurate information. If a filer reported receiving gifts from a prohibited source, VA ethics officials would refer the matter to the VA's Office of the Inspector General.

*Relevant Individuals*

11.    Persons 1 through 7, among others, were owners, executives, and employees of minority-owned businesses that performed prime contracting and subcontracting work for the VA, including but not limited to the VA EHRM project. At least because Persons 1 through 7 and their respective companies were doing business with or seeking to do business with the VA, had interests that could be substantially affected by the performance or non-performance of Defendant WINDOM's duties, or were employees of organizations made up of such people, they constituted prohibited sources under applicable ethics laws and regulations concerning acceptance of gifts.

12.     Persons 1 through 7 were also part of a core group of individuals that—inclusive of Defendant WINDOM—Defendant WINDOM began referring to in late 2019 as the "Power Group." The Power Group's ostensible purpose was for Defendant WINDOM to mentor its minority members on building successful government contracting businesses, including in connection with Cerner and the EHRM program.

13.     Between August 2017 and June 2021, in multiple locations, Defendant WINDOM attended events with other Power Group members and routinely accepted personal benefits such as gifts, meals, alcohol, entertainment, and other services from other members of the Power Group. When local, Power Group events typically, but not exclusively, occurred at Grace's Mandarin, a restaurant located in Oxon Hill, Maryland (in the National Harbor area), and Felt, a bar and lounge inside the nearby MGM National Harbor casino-hotel. Power Group members routinely covered Defendant WINDOM's associated expenses at these events. Defendant WINDOM used his position as Executive Director of OHERM to encourage, monitor, and facilitate contracting and subcontracting opportunities for members of the Power Group, related and unrelated to the EHRM project.

14.     In certain instances, Defendant WINDOM used his position as Executive Director of OEHRM to coerce the improper personal benefits described above. In addition, Defendant WINDOM used his position as Executive Director to pressure members of the Power Group to make business decisions unrelated to the EHRM project that advanced Defendant WINDOM's diversity objectives and then demanded to be rewarded. Defendant WINDOM also threatened economic and reputational harm to members of the Power Group, particularly but not only when they were not meeting his diversity-related networking expectations.

15.     Person 1, a member of the Power Group, was the owner of Company 1, a Maryland-

based information technology ("IT") firm that was a prime contractor to the VA on a contract that supported the VA EHRM project from its inception. In January 2019, Company 1 also became a subcontractor to Company 7, another prime contractor on the VA EHRM project. Defendant WINDOM was well aware of both contracts.

16.     Person 2, a member of the Power Group, was the owner of Company 2, a Washington, D.C.-based IT solutions company. Person 2 associated and at times worked with Persons 1, 3, and 4 but Company 2 did not work on the VA EHRM project.

17.     Person 3, a member of the Power Group, was the owner, President, and Chief Executive Officer of Company 3, a management consulting and IT services firm having headquarters in Washington, D.C. As Defendant WINDOM well knew, Company 3 was a subcontractor to Cerner on the VA EHRM project.

18.     Person 4, a member of the Power Group was an employee of Company 3 in June 2018, when Company 3 entered its subcontract with Cerner. Person 4 was also in an undisclosed romantic relationship with Defendant WINDOM from at least August 2016 to December 2018. In July 2018, after Defendant WINDOM demanded that Cerner improve its diversity profile and inclusion efforts, Cerner entered into a diversity-related contract with Company 3, with Person 4 as the lead on the diversity work. In or about October 2018, Person 4 formed Company 4 and became a subcontractor to Company 3. In 2019, Defendant WINDOM used his position as Executive Director to pressure Person 3 to complete diversity contract renewal negotiations with Cerner and to ensure that Person 4 was "happy" in related partnership modification negotiations between Person 3 and Person 4.

19.     Person 5, a member of the Power Group, was the co-owner and Chief Operating Officer of Company 5, a Virginia-based healthcare information technology company. As

Defendant WINDOM well knew, Person 5's company served as a subcontractor to Cerner on the VA EHRM project.

20.    Person 6, a member of the Power Group, was an employee of Company 6, Virginia-based IT services and technology consulting that, as Defendant WINDOM well knew, was a subcontractor to Cerner on the VA EHRM project.

21.    Person 7, a member of the Power Group, was an employee of Company 5 who carried out project management and business development responsibilities.

22.    Person 8 was a Vice President of Company 7. Company 7, as Defendant WINDOM well knew, was a prime contractor to the VA on the VA EHRM project overseen by Defendant WINDOM, primarily tasked with providing support services.

### COUNT ONE

23.    Paragraphs 1 through 22 are incorporated herein.

24.    Beginning on or before March 31, 2021, and continuing thereafter, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the Executive Branch of the Government of the United States, Defendant JOHN WINDOM did knowingly and willfully falsify, conceal, and cover up by trick, scheme, and device material facts; that is, Defendant WINDOM intended to and did conceal from the VA, OGE, and the public that he had accepted multiple gifts from Power Group members that he had a duty to disclose that created an actual and apparent conflict of interest between Defendant WINDOM's official VA duties and his private financial interests, to include approximately:

    a.    $8,200 in Louis Vuitton gift cards from Person 1, delivered through Person 2, and received on or about June 17, 2020;

    b.    $2,000 in cash from Persons 3 and 4, received on or about August 15, 2020;

c.  A High Efficiency Particulate Air ("HEPA") filter valued at $631 from Person 5, received on or about August 17, 2020;

d.  $1,800 in casino chips from Persons 5 and 7, which Defendant WINDOM demanded and received on or about November 4, 2020;

e.  a $1,000 gift card from Persons 3 and 4, received on or about November 19, 2020; and

f.  $2,000 in cash or casino chips from Persons 5 and 7, which Defendant WINDOM demanded and received on or about November 21, 2020.

### Purpose of the Scheme

25.  It was a purpose of the scheme for Defendant WINDOM to: (a) conceal from the VA, OGE, and the public that he had a financial relationship with members of the Power Group, to include his receipt of gifts described above in paragraph 24, and thus, an actual and apparent conflict of interest in overseeing government business in which members of the Power Group had a significant financial interest; and (b) use his official position at the VA to benefit and enrich Defendant WINDOM and other members of the Power Group and their companies by encouraging, monitoring, and facilitating contracting opportunities.

### Manner and Means of the Scheme

The scheme was executed through the following manner and means, among others:

26.  Defendant WINDOM did not disclose his financial and romantic relationships with members of the Power Group to contracting officials and agency ethics officials and counsel.

27.  Defendant WINDOM did not seek guidance from ethics officials about his acceptance of gifts and services from Power Group members or about any related reporting requirements.

28.  Defendant WINDOM failed to disclose gifts that he had a legal duty to report on

his Form OGE-278e.

29.    Defendant WINDOM repeatedly used personal communication methods to interact with Power Group members.

30.    Defendant WINDOM repeatedly reminded Power Group members to remain loyal and directed them to maintain confidentiality about their relationship with him.

31.    Defendant WINDOM made false statements to federal investigators to conceal the nature and extent of his relationship with Power Group members and the gifts and services he received.

32.    Defendant WINDOM attempted to impede law enforcement's investigation of his relationship with Power Group members.

### Execution of the Scheme

33.    In furtherance of the scheme to conceal the nature of his relationships with Power Group members that Defendant WINDOM had a duty to disclose, and to accomplish its purpose, Defendant WINDOM committed and caused to be committed the following acts, among others:

a.    On or about October 11, 2017, while Persons 5 and 7 were in Kansas City working with Cerner to develop the requirements the VA sought for the acquisition, Defendant WINDOM, in response to a chat message implying that Person 7 intended to bring another VA employee to the hotel room where Defendant WINDOM was having drinks with Person 5, Defendant WINDOM sent a message from his personal phone to Persons 5 and 6 stating, "A good comment to get you cut out."

b.    On or about August 5, 2018, Defendant WINDOM sent a message to Person 3 from his personal phone stating, "Don't mention to another person that you know me, interact with me or have any type of relationship with me."

c. On or about October 22, 2018, Defendant WINDOM, at his personal email address, and other Power Group members, received an email from Person 4 stating, among other things with respect to performing EHRM revenue cycle work that was not part of their contracts or subcontracts at that time:

> Person 1 et al,
>
> Thank you for the graphic (very helpful) and for your time on Friday. We definitely have our homework cut out for us, but we intend to get as knowledgeable on everything Revenue Cycle Management as possible. [Person 3] and I will review and advise of any questions we may have, and would love to discuss an opportunity where we can participate in some type of in-depth training that will help us to peel back the layers of this even further. Open for offers/suggestions on how best to coordinate a training activity in the next coming weeks.... Possibly in Vegas ☺.
>
> We too look forward to working with everyone on this critical piece of the Veterans care. Thanks again and have a great afternoon!

d. On or about November 8, 2018, Defendant WINDOM informed Person 1 that he wanted Power Group members to meet at Grace's Mandarin on November 15, 2018, to discuss performing revenue cycle work on the OEHRM project.

e. On or about November 16, 2018, at his personal email address, Defendant WINDOM received an email from Person 1 thanking him for the time they spent together the evening before and for the opportunity to serve Defendant Windom in the revenue cycle process and requesting Defendant WINDOM cancel a then-advertised procurement until the revenue cycle process envisioned by Person 1 was established.

f. On or about November 17, 2018, in response to the email in paragraph (f) above, Defendant WINDOM emailed Person 2 from his personal email address stating, "Spoke to the requirements folks, they said they need the capacity. More of the same that they already have. Good luck."

g.  On or about November 19, 2018, Defendant WINDOM sent an email to Person 1 and Person 8 introducing them to one another and explaining to Person 8 that Company 1 had available revenue cycle resources that would be a valuable addition to their revenue cycle project, and that "[w]e will need to staff up a separate project office to support Rev Cycle in the near future that will likely be a direct report to me."

h.  On or about November 28, 2018, Defendant WINDOM sent an email to Person 1 and Person 8 stating among other things, "Did you folks connect?"

i.  On or about December 21, 2018, Defendant WINDOM sent a message to Person 3 stating, among other things:

> Weird night last night. Not your fault personally but cleanup required. Can't say I like [Person 4's] cavalier response to these issues either. I was already exhausted but did not want to miss your event. The PA announcement of me let alone [Person 4] and me was ridiculous and did not kick the evening off right. I am a very discrete person as you know.

j.  On or about January 21, 2019, in response to a message from Person 1 stating his concern that the VA contracting office had published a Request for Information ("RFI") from vendors concerning the testing work then performed by Company 1, and asking Defendant WINDOM to "interfere now" and request the RFI be "pulled back," Defendant WINDOM sent a message to Person 1 from his personal phone stating "we will need to talk by phone . . . I am not changing out my te[s]ting contract during IOC or the first three waves. That would be stupid."

k.  On or about January 6, 2019, Defendant WINDOM received on his personal phone a message from Person 1 stating:

> Happy New Year. Just to give you a heads up, the Subcontract between [Company 1] and [Company 7] has yet to be completed, so no one from [Company 1] will be starting on Monday 1/7. However, we are close

11

and here's the status: We submitted 8 resumes and agreed to the terms of their subcontract. I believe [Person 8] will be meeting with you Monday 1/7 to seek your approval or ask questions about next steps. I am sure you can send him down the right path and complete the subcontract and all related paperwork. I am hoping we can start no later than Monday 1/14. Please let me know what I can expect as soon as you know what you guide him to do. Thank you and I look forward to supporting you in this very important Revenue Cycle Managment initiative.

l.   The same day, Defendant WINDOM responded:

Happy New Year to you too. [Person 8] owes me a staffing plan and organizational structure for my approval. I have seen neither. I will inquire is [*sic*] status when I return to the office. I told him this over three weeks ago.

m.  On or about January 11, 2019, Defendant WINDOM sent messages to Person 1 from his personal phone stating, among other things, "Have you closed the loop with [Person 4] on prospective training, solution support, etc." and "Don't forget the little people."

n.   On or about February 8, 2019, Defendant WINDOM sent messages to Person 1 from his personal phone stating, "Mention [*sic*] to ask you tonight. Did stuff get closed with [Person 4]?" and "Please provide me a closure status."

o.   On or about April 10, 2019, Defendant WINDOM sent a message to Persons 5 and 7 from his personal phone stating, "Man I just want to stop by and pick up the MacAllan. Tracking you down is getting old."

p.   On or about April 12, 2019, in an argument about Person 5's failure to attend social events, Defendant WINDOM yelled at Person 5 that he would "take [his] fucking contract."

q.   On or about June 12, 2019, Defendant WINDOM, in response to a message from Person 7 inviting Power Group members to a Company 5 bowling outing, stated:

12

> I am the only one that will say it. 24 hours notice for an evening event in DC. I have a congressional hearing at 1000 today that is going to be quite contentious following the [C]erner debacle.  I will highlight [Company 5's] inclusion efforts, notification and events planning as being grossly lacking. And will be requesting withhold [*sic*] of future payments and invites.  Need I say more.

r.  On or about July 29, 2019, Defendant Windom sent a message to Person 1 from his personal phone, stating among other things, "I think it would be nice to invite [Person 2] to the dinner tonight. I may need a designated escort."

s.  On or about August 8, 2019, Defendant WINDOM sent a message to Person 3 stating among other things:

> I get back in town. at 4:30 PM EST on Friday. Please be looking to meet sometime after 7. I am hoping to see and get a report of closure and moving forward on all matters of concern with a smiley face on all requisite contracts/agreements that get things moving towards the positive in earnest. I thought this was a done deal. I have been waiting for the requisite movement in this arena for it feels like an eternity.

t.  On or about August 9, 2019, Defendant WINDOM sent a message to Person 3 stating among other things:

> Just landed. Note from [Cerner employees] when I hit the ground of diversity contract being signed. You and [Person 4] on solid ground. She happy?
>
> Let's be looking at MGM at 8. May cost you a dinner as well. Check with boy at Felt on the cigar table and regular table reserve.

u.  On or about November 16, 2019, Defendant WINDOM sent a message to Person 1 and another Power Group member from his personal phone asking, "Kem concert tomorrow at MGM Can you get me in?" and asked for two tickets, one for himself and one for Person 4.

v.  On or about November 17, 2019, Defendant WINDOM sent a message to Person 1 and another Power Group member from his personal phone stating, "Damn near sitting

13

on the stage. You da man."

w. On or about January 3, 2020, Defendant WINDOM sent a message to the Power Group from his personal phone, stating:

> Folks as I recharge over the holiday period, I reflect on the successes of 2019 and remind myself of what is truly important. Family, friends, loyalty and effort remain at the foundation of any successes we have achieved. I am proud and honored to be able to call upon you first advice and support. That support will be even more critical in 2020 as I dig deep into the core of injustices and personal agendas. I added [Person 6] and [Person 2] on this note for a reason. Please include them in our future endeavors as I see them as new energy source and loyal contributors. The group is small for a reason. Actions speak FAR louder than words! All the best in 2020 and thank you for your unwavering support with never any strings attached. Take care and see you in 2020. Need a mentoring outing before the end of the month. As a reminder "loose lips sink ships."

x. On or about February 8, 2020, Defendant WINDOM sent a message to the Power Group from his personal phone stating, "Looking for sponsors amongst my mentors. Outing TBD. NEED Your SUPPORT. My boss was fired! We must celebrate that I was not."

y. On or about March 26, 2020, at his personal email address, Defendant WINDOM received an email from Person 1 stating, "This is what we sent in response to a[n] [Other Transaction Authority] on COVID-19. Love to do this for you and the VA. Please let me know if you want us to move to some next steps."

z. In or around March 2020, in response to Person 5 raising concerns with Defendant WINDOM about his interactions with contractors, Defendant WINDOM stated, "If you don't like it, get off. You can get the fuck off this ride."

aa. On or about June 17, 2020, at a celebration of Defendant WINDOM's conversion to a career SES employee, Defendant WINDOM received approximately $8,200 in Louis

14

Vuitton gift cards from Person 1, delivered through Person 2.

bb. On or about June 18, 2020, Defendant WINDOM sent a message from his personal phone to the Power Group stating, among other things:

> Great time folks. The camaraderie and support are much appreciated. Keep the press on in your respective arenas for continued success. No substitute for loyalty and trust. Please maintain those two elements and everything else will work itself out.

cc. On or about July 24, 2020, from his personal email address, in response to an email from Person 1 stating he had "a team of 8 specialized Analysts ready" to perform revenue cycle work, Defendant WINDOM stated, "Resumes?"

dd. On or about August 15, 2020, at a company picnic in Arlington, Virgina, Defendant WINDOM received a cash birthday gift of approximately $2,000 from Person 3 and Person 4.

ee. On or about August 15, 2020, Defendant WINDOM forwarded to Person 3 a screenshot of a message from a Cerner employee to Defendant WINDOM, in which the Cerner employee stated, "Also just signed off on [Company 3] renewal for 2021. Pushing forward," referring to a $1.7 million Diversity Recruiting & Talent Management contract between Cerner and Company 3.

ff. On or about August 17, 2020, at his residence in Maryland, Defendant WINDOM received a HEPA filter valued at approximately $631 from Person 5.

gg. On or about November 4, 2020, at the Aria Hotel in Las Vegas, Nevada, Defendant WINDOM demanded and received casino chips from Person 7, which Person 7 provided in the amount of approximately $1,800 after obtaining Person 5's consent and promise to reimburse Person 7.

hh. On or about November 18, 2020, in a Power Group chat planning a celebration of a

successful launch of technology (a "Go Live" celebration) for the following evening, Defendant WINDOM sent a message stating, "Chips!"

ii. On or about November 19, 2020, at the Go Live celebration, Defendant WINDOM received a gift card valued at approximately $1,000 from Person 3 and Person 4.

jj. On or about November 19, 2020, after the Go Live celebration, Defendant WINDOM sent a message to the Power Group stating among other things, "No substitute fur [sic] loyalty."

kk. On or about November 21, 2020, at Felt Lounge in the MGM National Harbor, Defendant WINDOM demanded casino chips from Person 7.

ll. On or about November 21, 2020, Defendant WINDOM sent messages to Person 5 stating, "Sitting with [Person 7] talking about chips. We good," and "You notifying him. Thank you sir."

mm. On or about November 21, 2020, in response to his demand for casino chips, Defendant WINDOM received cash or casino chips from Person 7 in the amount of approximately $2,000, which Person 7 provided after obtaining Person 5's consent and promise to reimburse Person 7.

nn. On or about November 22, 2020, Defendant WINDOM sent a message to Persons 5 and 7 from his personal phone in which he stated among other things, "Thank you both for your support last night. We can say we closed Felt at 10:00 pm in style."

oo. On or about March 31, 2021, Defendant WINDOM submitted a Form OGE-278e falsely reporting he had received no reportable gifts in calendar year 2020.

pp. Defendant WINDOM failed to seek guidance from an ethics official about whether he was permitted to accept or required to report any of the gifts he received in 2020.

qq. On or about June 15, 2021, when two federal law enforcement officers interviewed Defendant WINDOM about his contacts with members of the Power Group, Defendant WINDOM knowingly and willfully made several false and misleading statements. For example, Defendant WINDOM was asked and he answered the following questions:

A) Agent: Any VA employee you know ever receive cash, chips or credit from anyone?

Defendant WINDOM: No, not that I know of.

Agent: So you're not aware of any contractor ever providing chips or credit or cash to any VA employee.

Defendant WINDOM: No.

B) Agent: Sir, has any contractor ever tried to give you any gift?

Defendant WINDOM: No.

Agent: And so, obviously, you've never received any gifts from contractors?

Defendant WINDOM: No.

rr. On or about November 19, 2021, when two federal law enforcement officers again interviewed Defendant WINDOM about his contacts with members of the Power Group, Defendant WINDOM knowingly and willfully made several false and misleading statements. For example, Defendant WINDOM was asked and he answered the following questions:

A) Agent: So can you just, again, make utterly certain here you have not received anything of value from any of those people that I mentioned? And we'll exclude anything under the limit--

Defendant WINDOM: Right.

Agent: -- $25 –

17

Defendant WINDOM: Oh, yeah.

Agent: -- and anything that you've thrown in money to at a party, or anything like that.

Defendant WINDOM: No, I—

Agent: Anything above and beyond that.

Defendant WINDOM: No.

Agent: Nothing of value.

Defendant WINDOM: No.

B) Agent: I guess that kind of segues into the -- you know, the obvious question, right? None of the contractors or private companies that you interact with as part of your duties at the VA have paid you money.

Defendant WINDOM: No, no, not at all.

ss. On or about March 21, 2024, when two federal law enforcement officers again interviewed Defendant WINDOM about his contacts with members of the Power Group, Defendant WINDOM knowingly and willfully made several false and misleading statements. For example, Defendant WINDOM was asked and he answered the following questions:

A) Agent: Okay. And – and I'm going to ask you have you ever received any chips from any other of the – any of those contractors –

Defendant WINDOM: Yes

...

Agent: That was just a subcontractor hey, here. Take these chips. Gamble with it. Enjoy.

Defendant WINDOM: Yeah. Yeah, true.

B) Agent: And you're saying a couple hundred dollars is the maximum they ever gave you?

Defendant WINDOM: Yeah, several – several hundred in chips.

Agent: Several hundred? Okay.

Defendant WINDOM: It [*sic*] be chips, and because they had won some. Hey, man look what I won.

tt. After being approached by investigators, Defendant WINDOM instructed Person 4 and Person 6 to tell investigators that he paid for meals that he well knew had been paid for by members of the Power Group, and to instruct other members of the Power Group accordingly.

**Concealment of Material Facts,**
in violation of Title 18, United States Code, Section 1001(a)(1)

## COUNT TWO

34.    Paragraphs 1 through 33 are incorporated herein.

35.    On or about March 31, 2021, in the District of Columbia and elsewhere, Defendant JOHN WINDOM did willfully and knowingly make and cause to be made materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the Executive Branch of the Government of the United States, namely the VA and OGE, in that Defendant WINDOM falsely stated and represented on an OGE-278e form that he had received no reportable gifts, when, in truth and fact, as Defendant WINDOM then well knew and believed, Defendant WINDOM had received reportable gifts including approximately $8,200 in Louis Vuitton gift cards from Person 1 delivered through Person 2; $2,000 in cash from Persons 3 and 4; a $631 HEPA filter from Person 5; $1,800 in casino chips from Persons 5 and 7; a $1,000 gift

19

card from Persons 3 and 4; and $2,000 in cash or casino chips from Persons 5 and 7.

**False Statements**, in violation of Title 18, United States Code, Section 1001(a)(2)

## COUNT THREE

36.     Paragraphs 1 through 33 are incorporated herein.

37.     On or about March 31, 2021, in the District of Columbia and elsewhere, Defendant JOHN WINDOM, with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the investigation and proper administration of a matter within the jurisdiction of a department or agency of the United States, knowingly concealed, covered up, falsified, and made false entries in a record, document, and tangible object, to wit, Defendant WINDOM sub,itted and caused to be submitted an OGE-278e form with the VA and the OGE, which falsely failed to report gifts WINDOM had received when, as Defendant WINDOM then well knew and believed, Defendant WINDOM had received reportable gifts, including approximately $8,200 in Louis Vuitton gift cards from Person 1 delivered through Person 2; $2,000 in cash from Persons 3 and 4; a $631 HEPA filter from Person 5; $1,800 in casino chips from Persons 5 and 7; a $1,000 gift card from Persons 3 and 4; and $2,000 in cash or casino chips from Persons 5 and 7.

**Falsification of a Record or Document**,
in violation of Title 18, United States Code, Section 1519

A TRUE BILL:

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY FOR
THE DISTRICT OF COLUMBIA

FOREPERSON
Date:

By: _____

JOHN W. BORCHERT, CHIEF
FRAUD, PUBLIC CORRUPTION &
CIVIL RIGHTS SECTION